Affirmed and Memorandum Opinion filed January 28, 2010.

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00584-CR

___________________

 

Reza Haghigi Ahmadi, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 337th District Court

Harris County,
Texas



Trial Court Cause No. 1118773

 



 

 

MEMORANDUM OPINION

Appellant Reza Haghigi Ahmadi was
convicted of theft of property in an amount exceeding two hundred thousand
dollars and sentenced to seven years’ imprisonment.  In three issues, appellant
challenges the legal and factual sufficiency of the evidence and the trial
court’s explanation to the jury of the “beyond a reasonable doubt” standard.  We
affirm.  

 

                                                                                        
I.           
Factual and
Procedural Background

Appellant was indicted along with Nereo Garza for
three counts of theft of property allegedly occurring pursuant to a scheme and
continuing course of conduct lasting from June 2003–August 2005.  The State
alleged that appellant and Garza sought to unlawfully obtain money from three
complainants: Dennis Leahy as representative of Compaq/Hewlett Packard (“HP”),
Michael Cole as representative of Safeware Insurance Agency (“Safeware”), and
Jason Hyams as representative of St. Agnes Academy (“St. Agnes”).[1] 

In late 2000, St. Agnes implemented a program through
which each incoming student class would purchase a laptop for school use.  For
the first three years of the program, students purchased laptops from HP.  HP
provided a four-year manufacturer’s warranty for each computer, and Safeware offered
optional supplemental insurance policies to cover any repairs not covered by
HP’s warranty.  Shortly after the program began, St. Agnes hired Garza as a network
and software technician and assigned him to the “C.A.V.E.,” [2] the school’s computer
repair center.  Shortly before the 2003–2004 school year began, a massive
computer virus attack infected a majority of the students’ laptops.  Garza pushed
the school to hire appellant’s business, Intelligent Interface (“I.I.”), to repair
the computers.  Appellant agreed to send I.I. technicians to fix the laptops, and
the repairs were completed after approximately three weeks of work.  Appellant
did not charge the school for this repair work.  St. Agnes subsequently secured
I.I. as its HP warranty repair provider, and appellant began assigning I.I.
technicians to work in the C.A.V.E. full-time.  

In 2005, St. Agnes hired Jason Hyams as its
technology director.  Hyams soon became concerned with Garza’s activities in
the C.A.V.E.  He questioned the presence of a large inventory of replacement
parts for which there were no invoices or documentation, and also discovered
that Safeware checks made payable to St. Agnes were habitually deposited into
bank accounts managed by I.I. and a business account maintained in Garza’s
wife’s name.  Additionally, Hyams found lists of laptop serial numbers, part
numbers, and part descriptions organized sequentially by date.  He found several
instances where parts were ordered and received for specific laptops without corresponding
service tickets or student complaints matching the part orders.  After
comparing the laptop serial numbers with a list of student identification
numbers, Hyams determined that the lists were arranged in alphabetical order by
student name.  Hyams concluded that Garza was ordering excess parts from HP by
rotating laptop serial numbers every two months.  

St. Agnes questioned appellant and Garza about the
alleged rotation scheme and the replacement part inventory.  At that time, Garza
admitted making unnecessary part replacements.  Appellant and Garza both told
the school that they maintained the parts inventory so that repairs could be
completed more quickly.  Garza did not respond when the rotation scheme was
addressed, but Appellant consistently denied any knowledge of the scheme.  St.
Agnes terminated Garza’s employment after questioning and later severed its
relationship with I.I.  St. Agnes also notified HP, Safeware, and the police of
its concerns.  Appellant and Garza were subsequently arrested and indicted for theft. 
The two men were tried jointly, and the jury convicted appellant of theft
against Leahy and acquitted him of the charges against Cole and Hyams. 
Appellant was sentenced to seven years’ imprisonment and assessed a $5,000
fine.  

Appellant raises three issues on appeal.  In his
first and second issues, appellant contends the evidence is legally and
factually insufficient to sustain his conviction.  Appellant’s third issue
alleges that the trial judge’s statements during voir dire while discussing the
“beyond a reasonable doubt” standard impermissibly lowered the State’s burden
of proof.  

 

                                                                                                            
II.           
Sufficiency of the
Evidence

a.      Standards
of Review

In conducting a legal sufficiency review, we view the
evidence in the light most favorable to the verdict and determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Salinas v. State, 163 S.W.3d 734, 737 (Tex.
Crim. App. 2005).  We do not ask whether we believe the evidence at trial
established guilt beyond a reasonable doubt.  Jackson v. Virginia, 443
U.S. 307, 318–19 (1979).  We may not re-weigh the evidence and substitute our
judgment for that of the trier of fact.  King v. State, 29 S.W.3d 556,
562 (Tex. Crim. App. 2000).  In our review, we accord great deference “‘to the
responsibility of the trier of fact [to fairly] resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.’”  Clewis v. State, 922 S.W.2d 126, 133 (Tex.
Crim. App. 1996) (quoting Jackson, 443 U.S. at 319).  We presume that
any conflicting inferences from the evidence were resolved by the jury in favor
of the prosecution, and we defer to that resolution.  Id. at 133 n.13  

In evaluating the factual sufficiency of the
evidence, we view all the evidence in a neutral light and will set aside the
verdict only if we are able to say, with some objective basis in the record,
that the conviction is clearly wrong or manifestly unjust because the great
weight and preponderance of the evidence contradicts the jury’s verdict.  Watson
v. State, 204 S.W.3d 404, 414–17 (Tex. Crim. App. 2006).  We cannot order a
new trial simply because we disagree with the jury’s resolution of a conflict
in the evidence, and we do not intrude upon the fact-finder’s role as the sole
judge of the weight and credibility of witness testimony.  See id. at
417; Fuentes v. State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).  The
fact-finder may choose to believe all, some, or none of the testimony
presented.  Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App.
1991); In re A.B., 133 S.W.3d 869, 872 (Tex. App.—Dallas 2004, no
pet.).  In our review, we discuss the evidence appellant contends is most
important in allegedly undermining the jury’s verdict.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  We must explain in exactly what way
we perceive the conflicting evidence to greatly preponderate against conviction
if we determine the evidence is factually insufficient.  Watson, 204
S.W.3d at 414–17.  

b.      Analysis

Appellant contends the evidence is legally and
factually insufficient to support his conviction because it failed to show that
he intentionally engaged in fraud or theft either individually or as a party with
Garza.  A person commits theft if he unlawfully appropriates property with
intent to deprive the owner of property.  Tex.
Penal Code Ann. § 31.03(a) (Vernon Supp. 2008).  A person acts with
intent with respect to the nature of his conduct or to a result of his conduct
when it is his conscious objective or desire to engage in the conduct or cause
the result.  Id. § 6.03(a) (Vernon 2003).  Intent is a question of
fact for the jury.  Reed v. State, 158 S.W.3d 44, 48 (Tex. App.—Houston
[14th Dist.] 2005, pet. ref’d).  Intent is almost always proven through
evidence of the circumstances surrounding the crime.  Childs v. State,
21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d). 
Circumstantial evidence is as probative as direct evidence in establishing
guilt and is alone sufficient to establish guilt.  Guevara v. State, 152
S.W.3d 45, 49 (Tex. Crim. App. 2004).  Intent may be inferred from the words,
acts, and conduct of the accused, or from any fact that tends to prove its
existence.  See Smith v. State, 965 S.W.2d 509, 518 (Tex. Crim. App.
1998); Christensen v. State, 240 S.W.3d 25, 32 (Tex. App.—Houston [1st
Dist.] 2007, pet. ref’d); Reed, 158 S.W.3d at 48.  

Under the law of parties, a person is criminally
responsible for the conduct of another if “acting with intent to promote or
assist the commission of the offense, he solicits, encourages, directs, aids,
or attempts to aid the other person to commit the offense.”  Tex. Penal Code Ann. § 7.02(a)(2)
(Vernon 2003).  Circumstantial evidence alone may be sufficient to show the
defendant was a party.  Davis v. State, 195 S.W.3d 311, 320 (Tex.
App.—Houston [14th Dist.] 2006, no pet.).  The circumstantial evidence must
show that at the time of the offense, the parties were acting together and that
each party somehow contributed to the execution of their common purpose.  King
v. State, 17 S.W.3d 7, 15 (Tex. App.—Houston [14th Dist.] 2000, pet.
ref’d).  The jury may infer an agreement among a group working on a common
project when each person’s action is consistent with realizing a common goal.  Jarnigan
v. State, 57 S.W.3d 76, 87 (Tex. App.—Houston [14th Dist.] 2001, pet.
ref’d).  In determining whether the defendant participated as a party, we
review the events occurring before, during, and after the commission of the
offense.  Powelll v. State, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006); Duvall
v. State, 189 S.W.3d 828, 831 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d). 


The record establishes that Garza contacted appellant
sometime in early 2003 and that the two men agreed to make I.I. the HP warranty
repair provider for student laptops at St. Agnes.  As part of this arrangement,
appellant agreed to pay Garza a 19% “commission” for any HP warranty repairs
performed by Garza in the C.A.V.E.[3] 
Appellant and Garza never disclosed this agreement to any other party, and appellant
never offered I.I. employees working at St. Agnes a similar incentive
opportunity.  Appellant’s first commission check to Garza was dated before the
virus attack, but St. Agnes’s officials testified that I.I. was not affiliated with
the school until after I.I. fixed the students’ computers.  From this evidence,
the jury could infer that the agreement between appellant and Garza, apparently
made without St. Agnes’s permission, laid the framework for their scheme to
unlawfully obtain money from HP.  See Powell, 194 S.W.3d at 507
(allowing the consideration of events occurring before the offense in
determining whether the defendant participated as a party); King, 17
S.W.3d at 15 (listing acting together as one factor in determining whether
individuals are parties to an offense).  

Appellant was paid for repair work performed at St.
Agnes through a labor reimbursement program administered by HP.  Throughout his
relationship with St. Agnes, appellant was entitled to HP’s highest labor
reimbursement rate due to his status as a “premier” certified warranty
representative.[4] 
Appellant was required to comply with several requirements in order to maintain
this status, including submitting only one warranty part order per thirty days
for any individual laptop serial number and allowing only HP certified
technicians to order parts and perform repair work for warranty claims.  One
witness testified that appellant informed Garza that he could not submit more
than one student claim per month.  Christopher Cardenas, the I.I. employee
responsible for ordering parts for St. Agnes, stated that he was alerted on multiple
occasions by HP’s ordering system that warranty orders were being made for
individual laptops more than once every thirty days.  After asking appellant
how to proceed, he was told to “call [Garza] and tell him he cannot order on
that serial number.”  Garza would then either provide a different serial number
to use or tell Cardenas to forget about ordering for that particular computer. 


From this evidence, the jury could reasonably infer
that both appellant and Garza were contributing to the execution of a common
purpose.  See Jarnigan, 57 S.W.3d at 87 (jury may infer agreement when
each person’s actions are consistent with reaching a common goal); King,
17 S.W.3d at 15.  Garza’s employment by St. Agnes allowed access to HP
computers while appellant’s relationship with HP provided an opportunity to
obtain money through labor reimbursements.  Under the reimbursement process,
appellant would obtain more money through his premier status by ordering more
parts than were needed.  The jury could infer that appellant knew of Garza’s
rotation scheme after hearing that appellant was aware that Garza often changed
serial numbers after being notified that more than one claim had been made on individual
laptops during the previous thirty days, a practice appellant had informed
Garza was improper.  

The manner in which appellant and Garza ordered parts
from HP also supports a finding that appellant had knowledge of the rotation
scheme.  Appellant assigned Daniel Pham to work as a full-time HP warranty
repair technician in the C.A.V.E.  Because Pham was a certified technician, he
would typically be the individual responsible for diagnosing problems, ordering
parts, and performing repairs.  He stated that appellant instructed him to
“just listen to whatever [Garza] told me to do.”  Appellant denied giving this
instruction.  Roughly six months after Pham began working at St. Agnes, Garza
began performing diagnostic work and performing warranty repairs, despite not
being an HP certified technician.  Pham stated that, over time, he began
questioning the amount of repairs being made and believed that he was replacing
parts that did not need to be replaced.[5] 
According to Pham, Garza would write down part orders on tablets and send them
to Cardenas, who in turn ordered the requested parts from HP.  

Cardenas testified that appellant gave the impression
that Garza was in charge of I.I.’s work at St. Agnes.  He stated that he ordered
parts for St. Agnes based on the lists Garza e-mailed or faxed to him.  These
lists often provided no diagnostic reports.  Cardenas would call Garza and ask
for this information, and Garza would provide a few student complaints, but no
diagnosis for the issue.  Cardenas would then “enter whatever [diagnostic code
HP] provided to get close to whatever that problem [was],” and admitted that he
often entered diagnostic information after “guessing” the nature of the issue.[6]  Cardenas stated
that appellant knew orders were being placed based on Garza’s tablet sheets,
but did not believe that appellant knew of the rotation scheme.  But, when
questioned by the State, Cardenas agreed that appellant knew how Garza’s
ordering system worked “every step of the way.”  Garza also testified that he
“[k]ept [appellant] in the loop about how business was going” and what he was
doing at St. Agnes.  

Dennis Leahy, an HP security investigator, testified that
I.I.’s ordering process was “highly unusual.”  He stated that, typically, a
certified HP repair technician would perform a diagnosis and write up a
worksheet containing detailed information about the repair, including “the
customer’s name, time, date, diagnosis, what part is needed, [and] what model
number the computer is.”[7] 
Then, either the technician or an authorized clerical administrator would enter
the part request through HP’s electronic ordering system and enter a diagnosis
for each part ordered.  The evidence shows that I.I. did not follow this
procedure when submitting part orders for St. Agnes.  Additionally, a warranty
claim compliance manager for HP testified that I.I. filed warranty claims on
several laptops after Safeware provided funds to replace the computers.  Garza
admitted that he placed part orders through I.I. for laptops not covered by
HP’s warranty, and he also informed police that he fabricated or falsified many
of St. Agnes’s repair orders.  These false claims were passed on to I.I., who
in turn submitted them to HP to obtain reimbursement.  

The jury could consider this evidence and infer that
appellant was an active participant in Garza’s rotation scheme.  Garza pushed
for St. Agnes to hire I.I. to repair the computer virus, and appellant decided
not to charge the school for completing the repairs.  Pham and Cardenas stated
that appellant and Garza discussed business nearly every day, and Garza stated that
appellant was fully aware of his activities in the C.A.V.E.  The testimony
shows that appellant knew Garza was performing diagnostic work and making
warranty repairs despite not being an HP certified technician.  The jury could
also infer this knowledge from appellant’s commission payments to Garza.  The
rotation scheme allowed appellant to receive extra reimbursement from HP for
unnecessary part orders and repairs.  The jury could thus properly conclude
that appellant and Garza were parties to a scheme to improperly obtain money
from HP.  See Davis, 195 S.W.3d at 320 (stating circumstantial evidence
alone may be sufficient to prove party status); see also Powell, 194
S.W.3d at 507 (recognizing the “cumulative force” of all the circumstantial
evidence can be sufficient to establish the accused’s guilt beyond a reasonable
doubt).  

Appellant also argues that his genuine surprise at
being questioned about the rotation scheme and his full cooperation once the
scheme was investigated is evidence of his lack of complicity.  Multiple
witnesses testified that appellant appeared genuinely surprised when confronted
with the rotation scheme.  However, there is evidence that appellant did not
cooperate fully with investigators.  For example, appellant failed to provide
HP with proof of ownership of the large parts inventory at St. Agnes.  He also
did not disclose the commission agreement to the police after being asked
whether he gave anything of “value” to Garza.  His only disclosure was that he
provided Garza with rodeo tickets on one occasion.  Appellant also argues he did
nothing untoward because he reported Garza’s commission payments to the
Internal Revenue Service on 1099 forms.  But, a certified fraud specialist
testified that filing a 1099 form is not always evidence that payments are
legal and above-board.  After hearing this testimony, the jury could have reasonably
concluded that appellant’s behavior after being confronted by investigators was
inconsistent with his innocence.  See Chambers, 805 S.W.2d at 461
(allowing the fact-finder to believe all, some, or none of the testimony given
at trial).  

Viewing the evidence in the light most favorable to
the verdict, we conclude that a rational trier of fact could find that
appellant was a party to a scheme to commit theft and that he intentionally
committed the essential elements of the charged offense beyond a reasonable
doubt.  Having neutrally reviewed the entire record, including the evidence
appellant claims is most important in allegedly undermining the jury’s verdict,
we cannot say that the evidence preponderates against conviction or that
appellant’s conviction is clearly wrong or manifestly unjust.  Accordingly, we
find the evidence legally and factually sufficient to sustain appellant’s
conviction and overrule appellant’s first and second issues.[8]  

                 
III.           
Trial Judge’s
Description of Reasonable Doubt during Voir Dire

In his third issue, appellant argues that the trial
court’s explanation of proof beyond a reasonable doubt during voir dire
diminished the State’s burden of proof by allowing the jury to formulate a less
demanding standard of determining guilt than is constitutionally allowed. 
During voir dire, the trial judge stated that the State bore the burden of
proving the elements of each offense beyond a reasonable doubt.  The judge
continued:

Here’s the deal on reasonable doubt.  The Court is not
going to—not only here but anywhere else in this State—is not going to define
for you what a reasonable doubt is.  The Court of Criminal Appeals has told us
that is up to each individual juror to decide in his or her own mind so that
this juror gets to decide, this juror gets to decide, this juror gets to decide
through all 12 of you.  There’s not going to be a light, no buzzer, no whistle,
nothing that goes off to say, okay, the State has met its burden.  It’s up to
you to decide when you are convinced beyond a reasonable doubt as to each
element of the offense.

The judge then explained that
“the State does not have to prove its case beyond all doubt” and reiterated
that, in order to convict, each juror must be convinced beyond a reasonable
doubt that the State established each element of the offense.  Appellant
asserts it was improper for the trial judge to “tell each juror that he or she
can define the State’s burden of proof by his or her own standard.”

Appellant acknowledges on appeal that his counsel did
not object to the trial judge’s voir dire statements.  Generally, counsel must
object to a trial judge’s discussion of the reasonable doubt standard in order
to preserve error.  See Fuentes, 991 S.W.2d at 273 (finding appellant
waived his complaint by failing to object each time the trial judge discussed
the reasonable doubt standard).  Appellant cites Blue v. State, 41
S.W.3d 129 (Tex. Crim. App. 2000) (plurality op.) for the proposition that a
defendant need not always object to voir dire statements to preserve error.  In
Blue, a plurality of the Court of Criminal Appeals ruled that in certain
circumstances a judge’s voir dire statements could “taint[] appellant’s
presumption of innocence in front of the venire, [become] fundamental error of constitutional
dimension and require[] no objection.”[9] 
Id. at 132.  As a plurality opinion, Blue is not binding
precedent.  See Murchison v. State, 93 S.W.3d 239, 262 (Tex.
App.—Houston [14th Dist.] 2002, pet. ref’d).  Even if Blue were binding,
the trial judge’s statements in this case were not so serious as to taint the
presumption of innocence and obviate appellant’s need to object, as discussed
below.

Reasonable doubt is a simple term which jurors are
presumed to know in order to answer the question of guilt asked of them.  Dickerson
v. State, 740 S.W.2d 567, 572 (Tex. App.—Fort Worth 1987, pet. ref’d). 
Each juror must individually decide what amount of proof constitutes beyond a
reasonable doubt.  Murphy v. State, 112 S.W.3d 592, 597 (Tex. Crim. App.
2003).  There is nothing unlawful about differing thresholds of reasonable
doubt among jurors.  See Garrett v. State, 851 S.W.2d 853, 859 (Tex.
Crim. App. 1993).  Here, the trial judge’s explanation of reasonable doubt
required a presumption of innocence until the State met its burden of proof.  The
judge’s voir dire statements and the jury charge placed the burden of proof
squarely on the State.  Each potential juror was correctly instructed that they
would be required to determine whether the State proved each element of the
offenses beyond a reasonable doubt.  Thus, the trial judge’s comments did not taint
appellant’s presumption of innocence and create an impermissibly low standard
for finding guilt beyond a reasonable doubt.  Therefore, appellant waived error
by failing to object to the trial judge’s statements.  See Tex. R. App. P. 33.1; Fuentes,
991 S.W.2d at 273; see also Rodriguez v. State, No.
14-07-00618-CR, 2008 WL 4915814, at *4 (Tex. App.—Houston [14th Dist.] Nov. 18,
2008 pet. ref’d) (mem. op., not designated for publication) (holding that
appellant waived error by failing to object to the trial court’s definition of
reasonable doubt to the venire).  We overrule appellant’s third issue.

                                                                                                                                                  
IV.           
Conclusion

            Having determined
that the evidence was legally and factually sufficient to support the jury’s
verdict and that the trial court did not diminish the State’s burden of proof
by its voir dire statements concerning reasonable doubt, we overrule
appellant’s three issues and affirm the trial court’s judgment.  

                                                                                    /s/                    Leslie
B. Yates                                                                                                                                  

                                                                                                            Justice

 

 

Panel consists of Justices
Yates, Frost, and Brown.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] St. Agnes is an
all-girls’ preparatory school located in Houston.  





[2] C.A.V.E. is an acronym
for Computer Audio Visual Equipment.  





[3] Appellant paid Garza over
$171,000 in commissions from June 2003–August 2005, while Garza’s total salary
from St. Agnes during this time period was roughly $80,000.





[4] HP created a
certification process whereby warranty repair providers could obtain differing
levels of reimbursement for labor time.  Providers in each certification level
were reimbursed a different amount for labor.  From 2003–2005, HP reimbursed
appellant $761,552.50 for labor and provided I.I. with $2,496,958 in parts
associated with St. Agnes.  





[5] The number of HP warranty
claims submitted from St. Agnes decreased dramatically once Garza’s employment
was terminated.  According to Hyams’s testimony, St. Agnes submitted
approximately 1,300 warranty claims after Garza’s dismissal, as compared to
over 3,000 claims under Garza during 2005.  Pham also stated that the number of
warranty repairs decreased substantially once Garza stopped working for the
school.  Appellant argues the number decreased because the school switched to
more reliable IBM laptops; however, there were still students using HP
computers after Garza’s dismissal.  





[6] The State provided
Cardenas with one of Garza’s lists—which contained no diagnostic information—in
which Garza placed twenty-eight part orders.  Cardenas stated that rather than
asking Garza for diagnostic information for each part, he simply inquired about
the diagnoses for three or four parts and then filled in the diagnostic
information for the remaining parts on his own.  





[7] On at least one occasion,
HP conducted an independent investigation due to the high number of claims and
lack of documentation related to St. Agnes’s computers.  Appellant told HP that
the high number of claims was due to the student environment.  HP instructed
appellant to provide more thorough information in his future orders.  





[8] Because we determine the
evidence was sufficient to convict appellant as a party, we need not discuss
whether it was sufficient to convict him as a primary actor.  See Guevara,
152 S.W.3d at 49 (“[W]hen the trial court’s charge authorizes the jury to
convict on more than one theory . . . the verdict of guilty will be
upheld if the evidence is sufficient on any one of the theories.”).  





[9] The Blue trial
court apologized to potential jurors for a long delay, explained that the delay
was caused by the defendant’s inability to decide whether to accept a plea
bargain, and expressed its preference that the defendant enter a plea of
guilty.  Id. at 130.